**3**

# In The Matter Of:

*MADELINE RUIZ, et al.*
*v.*
*MARDI GRAS ENTERTAINMENT, INC., et al.*

_____

*TAYLOR, JESSICA - Vol. 1*
*April 27, 2011*

_____

**MERRILL CORPORATION**
LegaLink, Inc.
101 Arch Street
3rd Floor
Boston, MA 02110
Phone: 617.542.0039
Fax: 617.542.2119

```
                                                             Page 1
 1              COMMONWEALTH OF MASSACHUSETTS

 2   Hampden, ss.                        Superior Court

 3   - - - - - - - - - - - - - - - - - -

 4   MADELINE RUIZ, PAULA MASSA,

 5   GINA GINOLFI, ROBERT BRUSO,

 6   MAUREEN RUSHBY, JESSICA TAYLOR,

 7   RAMONA CRUZ, RAMONA ROGERS, and

 8   PATRICIA CARBONE, on behalf of themselves

 9   and allothers similarly situated

10              Plaintiffs

11   v.                                  CA No. 10-00034-A

12   MARDI GRAS ENTERTAINMENT, INC.,

13   THE WORTHINGTON SHOPS, INC.,

14   JAMES SANTANIELLO, ANTHONY

15   SANTANIELLO, HELEN SANTANIELLO,

16   and Their Other Corporate Presidents

17   and Officers

18              Defendants

19   - - - - - - - - - - - - - - - - - -

20            DEPOSITION of JESSICA TAYLOR

21       Wednesday, April 27, 2011 - 10:55 a.m.

22                 Seyfarth Shaw LLP

23                Boston, Massachusetts

24       Reporter:  Jill K. Ruggieri, RMR/CRR
```

Page 186

1   Who in management did you hear here say
2   that?
3 A  I don't know.
4 Q  Okay.
5 A  It's just a general type of general knowledge. And
6   maybe it's incorrect, but I -- that's what's assumed
7   by everyone as far as I've ever been led to believe.
8 Q  Okay.
9 A  No question about it.
10 Q  How do you know what other people assumed?
11 A  I don't, but just based on anything I've ever heard
12   anybody say regarding issues like this. Just taken
13   for granted, I guess.
14 Q  Are you familiar with Mardi Gras Entertainment, Inc.?
15 A  No, I'm -- that's who I think the checks come from,
16   but I don't know what it means or who it is.
17 Q  So you don't have any understanding as to what that
18   entity is?
19 A  No.
20 Q  You don't have any understanding as to what that
21   entity does?
22 A  Nope.
23 Q  You don't have any understanding as to who owns that
24   entity?

Page 187

1 A  I would -- I would only guess.
2 Q  Okay.
3   What about the Worthington Shops, Inc.?
4 A  That's a new thing that I've heard about. They --
5   I'm not sure.
6 Q  You don't know what it is?
7 A  No, I don't know.
8 Q  You don't know what it does?
9 A  Nope.
10 Q  You don't know who owns it?
11 A  No.
12 Q  Okay.
13   Do you know owns Lace?
14 A  No.
15 Q  Do you know who owns Fifth Alarm?
16 A  No.
17 Q  Do you know who owns Center Stage?
18 A  No.
19 Q  Do you know who owns Anthony's?
20 A  No. I mean, whose name is on the -- no, I don't.
21 Q  Are you familiar with an investigation conducted by
22   the United States Department of Labor involving Mardi
23   Gras?
24 A  I think so. Well, I don't know if there's more than

Page 188

1   one. Maybe I don't know about --
2 Q  So you're familiar with one investigation?
3 A  Yes.
4 Q  What do you know?
5 A  Well, I remember -- this is probably before '07, I
6   think, that someone came from the Department of Labor
7   and they were supposed to interview us all, all the
8   bartenders and stuff, in the basement at the Mardi
9   Gras.
10 Q  Okay.
11 A  I don't know if the thing that's going on now or
12   happened or whatever is associated with it or not,
13   but --
14 Q  Did you speak with anybody at that time?
15 A  Yes.
16 Q  Who did you speak with?
17 A  I don't remember the person's name.
18 Q  But you spoke with somebody from the Department of
19   Labor?
20 A  Yes.
21 Q  And you believe this was before 2007?
22 A  I think so, because -- yes.
23 Q  Did you have any discussions with anybody from the
24   Department of Labor after 2007?

Page 189

1 A  They sent us some kind of an inquiry or some kind of
2   a statement.
3 Q  When was that?
4 A  It was regarding working at the Mardi Gras and labor
5   and tips. Tips, wages.
6 Q  Was this at the same time, around 2007?
7 A  This was -- no, this was after. This was after I
8   didn't work there anymore. This was probably like
9   '08 into '09, I think.
10 Q  So do you believe that this was separate?
11 A  I don't know.
12 Q  Do you remember who you spoke with back in 2007?
13 A  No, it wasn't 2000 -- well, there was one that was
14   probably 2006 where we had to go at work, go down the
15   cellar and talk to this guy.
16 Q  Do you know if that individual was from the
17   Department of Labor?
18 A  Yes.
19 Q  Okay.
20 A  And I don't know when it was, but it was before -- it
21   was probably -- oh, God, it's so hard to remember
22   these dates, but --
23 Q  Let's do this. Let's talk about the most recent one
24   that you remember.

Page 190

1  A  Okay.
2  Q  Okay.
3     So you remember more recently after you
4  stopped working there --
5  A  I got a letter in the mail from the United States
6  Department of Labor regarding working at the Mardi
7  Gras and the tips and the wages and then had to have
8  a phone interview with somebody.
9  Q  Okay.
10    And this occurred after you stopped working
11 there?
12 A  Yes.
13 Q  So this was sometime at the end of 2008 or into 2009?
14 A  Yes, ish.
15 Q  You can say that confidently?
16 A  It was after -- I know it was after I stopped working
17 there, and it wasn't that long, so I'm -- it's within
18 probably six months of me not working there anymore.
19 Q  Okay.
20    The letter, where's the letter?
21 A  Probably at my house.
22 Q  Okay.
23    MR. CALIFANO:  Tim, is that a basis for a
24 request for a supplemental production?

Page 191

1     MR. ZESSIN:  Sure.
2  Q  Is there any reason why you didn't turn that over in
3  connection with defendants' request for production of
4  documents in this case?
5  A  I probably just didn't -- I don't know.
6  Q  Did you read the request for production of documents?
7  A  I probably did.  I -- I -- I can't remember right
8  now, but I'm sure I did.  I read everything, stuff
9  like this, so --
10 Q  Sure.
11    Will you take a minute to --
12    MR. CALIFANO:  Can we mark this, please?
13    (Discussion off the record.)
14    (Recess.)
15    (Exhibit No. 4 marked for identification.)
16 BY MR. CALIFANO:
17 Q  Ms. Taylor, I'm going to give you what we marked as
18 Exhibit 4.
19 A  Okay.
20 Q  If you will just flip to the fifth page, there are
21 numbered requests.
22    Do you see that?
23 A  Mm-hmm.
24 Q  Will you please flip through the numbered requests

Page 192

1  and tell me if any of them look familiar to you,
2  please?
3     (Deponent read document.)
4     MR. ZESSIN:  We're still off the record?
5     MR. CALIFANO:  No, we're on the record.
6  Did my question get on the record?
7     MR. ZESSIN:  Sorry, I just wanted to make
8  sure.
9  A  I don't know.
10 Q  You don't know if they look familiar?
11 A  They don't look familiar.
12 Q  So as you sit here today, you have no recollection of
13 ever seeing these requests before.
14 A  No, not this.
15 Q  Okay.
16    Do you -- did you at any point search for
17 documents responsive to any of these requests?
18 A  Well, I was asked to provide, like, anything that I
19 might have, and I just have check stubs and stuff
20 like that.
21    I don't remember this, like, every bank
22 account and stuff.
23 Q  Did you search for documents reflecting income that
24 you've earned from any source from 2007 to the

Page 193

1  present?
2  A  Did I --
3  Q  Not just the Mardi Gras, but from any source.
4  A  What's the present like?  The present now or the
5  present up until I stopped working there, when this
6  was filed or up to when --
7  Q  Up to the date of this response, March of 2010.
8  A  No.
9  Q  You did not?
10 A  Say it one more time.  I did not --
11 Q  Search for documents reflecting income from sources
12 other than Mardi Gras between March of 2007 and March
13 of 2010?
14 A  I don't think so.
15 Q  Okay.
16    Did you search for any documents concerning
17 any claim for -- well, the claim for
18 unemployment that you made?
19 A  Nope, I did not.
20 Q  And as you testified earlier you did file a claim for
21 unemployment?
22 A  Yes.
23 Q  You have received documents from the unemployment
24 board?

Page 194

1  A  Yes, yes, I have -- I'm a pretty good document
2     keeper, so whatever it relates to, I usually have it.
3  Q  Okay.
4        So you do have documents that are
5     responsive to that request?
6  A  Yes.
7  Q  Okay.  Back up to number one for a second.
8        You have documents that are responsive to
9     the request for documents reflecting income that
10    you have earned from sources other than Mardi
11    Gras between 2007 and 2010?
12 A  Do I have some?  Yes.  Tax returns and stuff?  Why do
13    you have to --
14       (Deponent read document.)
15 Q  I think you testified before that you didn't look for
16    your communications with Mr. Bruso, right?
17 A  Right.  I forgot about him.  Sorry.
18 Q  Okay.
19       Did you search for documents responsive to
20    Request No. 10?
21 A  No.
22 Q  And --
23 A  No.
24 Q  What about --

Page 195

1        MR. ZESSIN:  Make sure you read it over.
2  A  There's so many parts to it.
3  Q  How about this.  I'll clarify.
4        Did you search for documents regarding the
5     Department of Labor?
6  A  You mean like to send to you guys?
7  Q  Yes.
8  A  For the purpose of this case?  No, I -- I don't need
9     to search.  I know where they are.
10 Q  Where are they?
11 A  At my house.
12 Q  How many documents do you have?
13 A  Oh, I don't know; but, I mean, if I got a letter from
14    the government, I save it, so --
15 Q  Did you receive -- I think you said you received a
16    letter from the Department of Labor, right?
17 A  Yes.
18 Q  Okay.
19       Did you turn that letter over in this case?
20 A  No.
21       MR. CALIFANO:  Tim, can we make another
22    request for supplemental production?
23       MR. ZESSIN:  Yes, we will supplement.
24       MR. CALIFANO:  Okay.

Page 196

1        THE DEPONENT:  I just wanted to read the
2     front.
3  BY MR. CALIFANO:
4  Q  Okay.
5        Let's go back to this letter that you
6     received from the DOL after you stopped working
7     at Mardi Gras.
8        Do you recall who sent the letter?
9  A  I'm not sure.
10 Q  Do you recall what the letter said?
11 A  Not really.  I think that it said they will be
12    calling you for a phone interview regarding your
13    employment at the Mardi Gras, but I --
14 Q  Did you have a phone interview?
15 A  Yes.
16 Q  Do you recall when that phone interview occurred?
17 A  I think it was shortly after -- I think it was in
18    '08, but I'm not sure.  I think it was after I didn't
19    work there, but not too long -- I think it was still
20    kind of nice out.  I don't know.
21 Q  Okay.
22       Do you recall who you had an interview
23    with?
24 A  I'm not sure, but I know there was one guy's name.  I

Page 197

1     don't know if he's the person that I had the
2     interview with, so I can't say if --
3  Q  What's the individual's name that sticks out in your
4     head?
5  A  Martin.
6  Q  Andexler?
7  A  Yes.  But I don't know if he's the one that actually
8     was the phone interview guy, but I think he was -- I
9     don't know.
10 Q  Did the person with whom you had a phone interview
11    explain to you why they were contacting you?
12 A  It was a little bit vague, the whole thing, but it
13    had to do with, like, they wanted to know about the
14    situation, how you got paid and about the tip-out.
15       But it wasn't really -- it didn't seem
16    that in depth, and --
17 Q  How long was the conversation?
18 A  I can't remember.
19 Q  Okay.
20       And you -- what did you explain to the
21    individual about how you got paid?
22 A  I just told the truth about whatever I got paid by
23    the hour, minimum wage.
24 Q  Did you discuss your tips?

Page 198

1  A  I don't remember.  Plus tips, I probably -- I would
2     have said.
3  Q  Did you discuss the practices by which you received
4     tips?
5  A  What, bartending?
6  Q  Yes.
7  A  Probably.  I'm not --
8  Q  Did you discuss -- did you discuss this fee that you
9     claim to have had paid?
10 A  Probably.
11 Q  You don't recall specifically, but probably?
12 A  I'm sure, because I think that's probably what the
13    point was.  I don't really remember the conversation.
14    I just, umm, remember that I had a phone interview
15    and that they were supposedly contacting and calling
16    everybody, at least bartenders, that worked at the
17    Mardi Gras.
18 Q  Did anybody explain to you from the Department of
19    Labor how that came about, why they were doing this?
20 A  No.  I want to know.
21 Q  Did you ask?
22 A  No, they -- I don't think they'll tell you.
23 Q  How long did you say the interview lasted?  I forgot.
24 A  I didn't.  I -- I would guess about 20 minutes.

Page 199

1  Q  Okay.
2        Other than this telephone interview, did
3     you ever have any other communications with the
4     Department of Labor?
5  A  I think they mailed something for you to sign, and
6     I'm not sure, I can't remember what it was --
7  Q  So this is something different than the letter they
8     sent to you?
9  A  I'm not sure if it's different, but I think there was
10    probably -- I think the first thing that I said I
11    think was like a notice.
12       And then I believe that there was
13    something else, like you sign when you worked
14    there and what your name is and whatever.  It
15    was like a small form, I think.
16 Q  Okay.
17       Did you send that form to somebody?
18 A  I believe so.
19 Q  Who?
20 A  Just back to whoever at the Department of Labor.
21 Q  Okay.
22       Did you keep a copy of whatever it was that
23    you sent?
24 A  Maybe.  I make copies if I can, but I don't have a

Page 200

1     copier, so I could have -- I like to make copies of
2     stuff like that.
3  Q  It's your usual practice to do that?
4  A  If it's an important thing I want a record of,
5     communication with government agency, yes.
6  Q  So you considered this to be an important thing that
7     you would want a record of?
8  A  I -- I think so.  I don't know if I made a copy, but
9     I -- it's probably like a 70 percent chance that I
10    did make a copy.
11 Q  Okay.
12 A  I would probably have the request letter.
13 Q  Did you provide -- other than this document you
14    signed and sent back, did you provide any other
15    documents to the Department of Labor?
16 A  No, I don't think so.
17 Q  Okay.
18       Did they send you any other documents?
19 A  I don't think so, no.
20 Q  Do you know if anybody else was interviewed?
21 A  Yes, I think so.  I think they called -- I know my
22    friend Beth, she was a bartender with me.
23 Q  You know Beth spoke with the Department of Labor?
24 A  I think so.  I think everybody -- they called you and

Page 201

1     asked you --
2  Q  I just want to be clear.
3        How do you know?  Why do you think that
4     Beth did?
5  A  Because she called me and asked me if I got a letter
6     or texted me or something.
7  Q  Did she tell you she spoke to the Department of
8     Labor?
9  A  I can't remember.
10 Q  Did anybody else tell you they spoke to the
11    Department of Labor?
12 A  I think so, but I don't remember who or --
13 Q  What's Beth's full name?
14 A  Beth Papesh.
15 Q  Can you spell that?
16 A  P-A-P-E-S-H.
17 Q  Was she a bartender at Mardi Gras?
18 A  Yes.
19 Q  Did you discuss the substance of any discussion that
20    she had with the Department of Labor?
21 A  No, I don't think so.  I don't even really remember.
22    I don't know if maybe it was a text message or
23    something.  I think she called me.
24 Q  Not including your attorney, did you have any

Page 202

1   discussions with anybody else about the Department of
2   Labor?
3  A  I don't think -- maybe Bobby, but I -- just kind of
4   like, Did you get a phone call from the Department of
5   Labor or --
6  Q  Mr. Bruso wasn't a bartender, correct?
7  A  Correct.
8  Q  So what -- why would you think that he would be --
9  A  I -- I don't think that he would be.  I think that he
10    asked me, because he -- I don't know if it's -- they
11    contacted him, too, or what.
12  Q  So you're saying that Mr. Bruso told you that he had
13    spoken with the Department of Labor?
14  A  Or maybe he asked -- I don't know, but I think --
15    like, he was aware of it, and I'm sure that it's come
16    up, but I don't know in what context or what we
17    talked about, but --
18  Q  You don't know how Mr. Bruso was aware of it?
19  A  I don't know.  I don't know how he was aware of it,
20    but --
21  Q  Okay.
22      Other than your attorneys, have you had
23    discussions with anyone about the allegations in
24    the complaint?

Page 203

1  A  My boyfriend.
2  Q  Who is that?
3  A  Sean.
4  Q  I think you identified him earlier.
5      What's his last name?
6  A  Yes, Mitchell.
7  Q  Anybody else that you haven't previously identified
8    today?
9  A  Like about the -- that I'm involved in this?
10  Q  Any aspect of your allegations in your complaint.
11  A  Not really.  Let me think.  Let me think.
12  Q  Do you want to take a break and get something to eat?
13  A  No, no, I'm good.  I just ate.  I don't think so.
14  Q  Do you know if the Department of Labor concluded an
15    vision an investigation?
16  A  I -- I don't know.  I feel like I heard that, but
17    then -- but I don't know where I heard it and I
18    haven't heard anything from them or about it
19    formally, so I'm not sure.
20  Q  So you don't know what the outcome, if any, of any
21    Department of Labor investigation was?
22  A  No.
23  Q  So you don't know whether or not the Department of
24    Labor concluded that you were owed any money?

Page 204

1  A  No, no, I don't.
2  Q  Okay.
3  A  Actually, I think they were trying to contact them
4    or -- I -- what did we do.
5      I don't know if it was the Department -- I
6    can't remember.  I don't know if I heard
7    anything about it.
8  Q  Let's go back and see if we can calculate what you
9    claim your damages to be.  I think you had said that
10    you had paid $25 per shift, right?
11  A  Yes.
12  Q  For four shifts per week?
13  A  Yes.
14  Q  Totaling 400 per month, right?
15  A  Yes.
16  Q  Okay.
17  A  Or however many days I worked in a month.  That's an
18    approximate number.
19  Q  Okay.
20      Do you have any understanding as to what
21    the statute of limitations is in this case?
22  A  Actually, I -- I don't understand it, no.
23  Q  Do you have any basis to dispute that the statute of
24    limitations is two years?

Page 205

1  A  No, I don't have any basis to dispute that.
2  Q  So if we use two years as the statute of limitations,
3    that would mean that you worked for approximately
4    eight months during the statute of limitations.
5      Would you agree with that?
6  A  No.
7  Q  No?  Why not?
8  A  Because I would at least consider it from the time I
9    was let go, going back.
10  Q  And if we use two years as the statute limitations
11    and the complaint was filed in January 2010, two
12    years before that would be January of 2008, right?
13  A  Right.  I know what you're saying, but that's not
14    what I would consider to be two years, because it
15    takes a long time to get to that point, but I --
16  Q  I understand.
17      You're saying that you would start the
18    statute of limitations from the day that you
19    stopped working there and count backwards?
20  A  Yes.
21  Q  Okay.
22      For the sake of argument, let's use the day
23    that you filed the complaint, okay?
24  A  Okay.