**4**

# In The Matter Of:

*MADELINE RUIZ, PAULA MASSA v.*
*MARDI GRAS ENTERTAINMENT, INC.,*

_____

*CARBONE, PATRICIA A. - Vol. 1*
*April 18, 2011*

_____

**MERRILL CORPORATION**
LegaLink, Inc.

101 Arch Street
3rd Floor
Boston, MA 02110
Phone: 617.542.0039
Fax: 617.542.2119

Page 242

1  any of the terms of that agreement?
2  A. No.
3  Q. Had you already undertaken the process of
4     filing an age discrimination charge against
5     Mardi Gras at the time that you were
6     presented with that agreement?
7  A. I had called them, but I wasn't pursuing it
8     yet. I just had it on the back -- I didn't
9     fill out the paperwork. I was a little
10    nervous about doing it.
11 Q. So when did you actually fill out the
12    paperwork?
13 A. After they did that to me at Lace.
14 Q. Sometime after February 8, 2011?
15 A. Um-hmm.
16 Q. Sorry. February 8th of 2010?
17 A. Yes.
18 Q. Do you recall how long after February 8,
19    2010, you submitted that paperwork?
20 A. Less than a month.
21 Q. Did you understand there to be any
22    relationship between the proposed agreement
23    that you were presented in conjunction with
24    the beginning of your employment at Lace and

Page 243

1  any potential age claim you might assert?
2  A. I didn't quite get that. Sorry.
3  Q. Did you have any understanding about the
4     effect that signing the agreement that was
5     handed to you would have on any age claim
6     that you could assert against the
7     defendants?
8  A. No, I didn't put that thought into it. That
9     is not why.
10 Q. And did you put any thought into whether
11    signing that agreement would have any effect
12    on any wage claim that you might assert
13    against the defendants?
14 A. No.
15 Q. Basically, it just seemed unusual to you?
16 A. Yes. It just didn't seem right.
17 Q. You have mentioned a couple of times to me
18    thus far in your deposition a proceeding
19    that was initiated and conducted by the
20    United States Department of Labor; is that
21    right?
22 A. Yes.
23 Q. And you have told me that you are not sure
24    when exactly that proceeding was commenced;

Page 244

1  is that fair to say?
2  A. Yes.
3  Q. And having had some time to think about it,
4     can you narrow down at all when you were
5     first contacted by the United States
6     Department of Labor?
7  A. No, I can't. I received something in the
8     mail, and they were asking -- you know, it
9     was asking all sorts of questions, and that
10    you were just to mail it back in. You
11    didn't have to meet with anybody. You just
12    had to fill it out and mail it back in and
13    that it would not -- they couldn't say your
14    name to Jimmy or Sherri.
15 Q. Did it mention Jimmy or Sherri by name?
16 A. Well, it just said, you know.
17 Q. The employer?
18 A. The employer.
19 Q. Do you still have the document that you
20    received in the mail?
21 A. Actually, no. When I got that one, the
22    first thing I did was give it to Sherri.
23 Q. What did you tell her when you gave it to
24    her?

Page 245

1  A. I just said, "This came in the mail. I
2     don't know what you want to do with it."
3  Q. What did she say?
4  A. "I will take care of it."
5  Q. Anything else come of that?
6  A. No. And then I want to say probably about
7     eight months later, they sent me another
8     one.
9  Q. "They," the Department of Labor, sent you
10    another one?
11 A. Yes.
12 Q. Can you place that anywhere in time when you
13    received the second letter?
14 A. Yes, that was around --
15       (Pause.)
16 A. That was around the time right after they
17    took our job from Fifth Alarm.
18 Q. I am not sure I am following you there.
19 A. That is when we lost our job at the Fifth
20    Alarm.
21 Q. So mid-2009?
22 A. Yes.
23 Q. Is when you received the second letter?
24 A. Yes.

Page 246

1  Q.  So the first letter you probably would have
2      received in the beginning of 2009 or the end
3      of 2008; is that fair to say?
4  A.  Yes.
5  Q.  How many total letters did you receive from
6      the Department of Labor?
7  A.  Just those two.
8  Q.  What did you do with the second one?
9  A.  Filled it out and sent it back.
10 Q.  Did you keep a copy of it?
11 A.  No.
12 Q.  Do you recall to whom you sent it?
13 A.  No.  They called me, and I had an
14     appointment with Martin.
15 Q.  This is after you sent in the second filing?
16 A.  Yes.
17 Q.  We will get to that in a second.
18         Do you recall any information that
19     was asked of you in this second form?
20 A.  If I remember correctly, it just asked how
21     many hours I worked and if I had to pay out
22     anybody, if I had to pay any tip outs.
23 Q.  What did you put on the form?
24 A.  I put what I worked and what I paid.

Page 247

1  Q.  What did you describe about what you paid?
2  A.  I put 25 a week, and then I would put for
3      the bouncers and all of that.
4  Q.  And you detailed all of this information in
5      the second form that you sent back to the
6      Department of Labor?
7  A.  Yes.
8  Q.  You just said that you filled out that form
9      to reflect that you tipped out $25 a week?
10     Did I hear you right?
11 A.  A shift.
12 Q.  Do you recall any other information that was
13     included on that form?
14 A.  No.
15 Q.  Are you confident that that was all that was
16     on the form?
17 A.  No.  I don't remember.  It was a while ago.
18     I don't remember everything that was on
19     there.
20 Q.  How much time passed between when you
21     received that form in the mail and when you
22     sent it back?
23 A.  Probably about a month and a half.
24 Q.  Why did you wait so long to fill it out?

Page 248

1  A.  Because I really didn't want to.
2  Q.  You understand you weren't obligated to do
3      that?
4  A.  No.
5  Q.  So at some point, you did want to?
6  A.  Yes.  It was an argument I had with myself.
7  Q.  What made you decide that you did want to do
8      that?
9  A.  I didn't want to do it because I was with
10     Jimmy for so many years, and I am a very
11     loyal person, so I didn't want to send it.
12     But then when I kept thinking about how the
13     hell am I going to feed my kids, it made me
14     send it.
15 Q.  So it was your understanding that you might
16     get paid something out of sending this back?
17 A.  No.  Actually, yes.  No.  No.  Because I
18     figured they were going to take whatever
19     with it.
20 Q.  So what is the connection between filling
21     out the paperwork and feeding your kids?
22 A.  Because I was mad at him.  I was mad at what
23     he did to me.
24 Q.  In terms of him firing you?

Page 249

1  A.  Yes.
2  Q.  And that is why you began to participate in
3      this Department of Labor investigation?
4  A.  Yes.  That is why the first time I gave it
5      to Sherri, so she could do what she wants
6      with it.
7  Q.  So they made you mad, and so you changed
8      course and decided to fill out the
9      paperwork?
10 A.  Yes.
11 Q.  And your decision to fill out the paperwork
12     didn't really have anything to do with any
13     change in the practices that were in place;
14     it was just you were now mad at them?
15 A.  What do you mean, the "practices"?
16 Q.  Nothing had changed between the time of
17     time --
18         MR. MILLER:  Strike that.
19 Q.  In terms of the practices that you described
20     in the form, do you understand?
21 A.  The paying the $25 a shift, yes.
22 Q.  The information that you provided in the
23     form, nothing changed between the period of
24     time that you didn't want to turn the form

Page 250

1  in and your decision to return the form, in
2  terms of that practice, that was consistent?
3  A. Right.
4  Q. The only thing that changed was that you got
5  angry with Mr. Santaniello and the other
6  defendants in this action?
7  A. Yes.
8  Q. And wrapped up in that anger that you had
9  towards Mr. Santaniello and the defendants
10 in this action, was that also your
11 contention that they fired you because of
12 your age?
13        MR. CASAVANT: Objection.
14 A. No.
15 Q. That is not one of the reasons you were mad
16 at them?
17 A. No.
18 Q. Why were you mad at them?
19 A. Just for everything that they did. The
20 whole roundabout for everything they did.
21 Q. And that didn't include your contention that
22 they fired you because of your age?
23 A. No. At that point, I had been tossed around
24 from bar to bar. At that point, that was

Page 251

1  just the straw that broke the camel's back.
2  Q. That is what I am trying to understand, I
3  guess. What is the straw that broke the
4  camel's back?
5  A. When I got a phone call from a bartender
6  that I no longer had a job.
7  Q. So when they fired you?
8  A. Yes. They didn't fire me. They had a
9  bartender fire me.
10 Q. And it is your contention that they fired
11 you in part because of your age?
12 A. Yes.
13 Q. And that made you mad?
14 A. Yes. I wasn't dancing about it.
15 Q. And that is what eventually caused you to
16 decide to return the paperwork to the
17 Department of Labor?
18 A. Yes.
19 Q. Other than that form, did you ever submit
20 any other paperwork to the Department of
21 Labor?
22 A. No.
23 Q. You told me about an appointment you had
24 with somebody named Martin; is that right?

Page 252

1  A. Yes.
2  Q. Do you know his last name?
3  A. No.
4  Q. Does the name Andexler sound familiar?
5  A. No, it doesn't.
6  Q. You don't think that was his last name?
7  A. No.
8  Q. If you remember his last name at some
9  subsequent point, please let me know.
10       Where did you meet with Martin?
11 A. Downtown. Downtown somewhere.
12 Q. At the offices of the U.S. Department of
13 Labor?
14 A. Yes.
15 Q. When was that?
16 A. About a year and a half ago, maybe. A year
17 ago.
18 Q. So fair to say between January and June of
19 2010?
20 A. Yes.
21 Q. So it was quite a while after you sent this
22 form back?
23 A. Yes.
24 Q. Do you have a sense of how much time passed

Page 253

1  between when you returned the second form
2  and when you met with Mr. Andexler?
3  A. No, I don't.
4  Q. But it was more than a year?
5  A. No. It was under a year.
6  Q. You said at least six months?
7  A. Yes.
8  Q. Who contacted you to arrange this
9  appointment?
10 A. Martin.
11 Q. He called you himself?
12 A. Yes.
13 Q. What did he say?
14 A. That he wanted to make an appointment for me
15 to come down and talk to him.
16 Q. What did you say?
17 A. Okay.
18 Q. Were you working at any of the defendants'
19 at this point?
20 A. No.
21 Q. This was after you last worked at Lace?
22 A. No. This was after I worked at the Fifth
23 Alarm.
24 Q. Were you working at the Mardi Gras at that

Page 254

1 point?
2 A. No, it was in between.
3 Q. So it was between mid-May 2009 and
4    June 2009?
5 A. Yes. I really don't remember the dates.
6 Q. But do you remember that it is between the
7    time that you left the Fifth Alarm and you
8    went back to Mardi Gras?
9 A. Yes. Know I wasn't working.
10 Q. And you have told me previously that you
11    left the Fifth Alarm in mid-May 2009; right?
12 A. Yes. And then I met with Jimmy in June.
13 Q. So that was roughly the period of time that
14    you met with Mr. Andexler?
15 A. Yes.
16 Q. Did you tell anyone that you were meeting
17    with Mr. Andexler?
18 A. No.
19 Q. So you didn't tell Mr. Santaniello that?
20 A. No.
21 Q. You didn't tell Sherri that?
22 A. No.
23 Q. You didn't tell any representative of the
24    defendants that you were meeting with

Page 255

1    Department of Labor?
2 A. No.
3 Q. And you didn't tell any representative of
4    the defendants that you had submitted the
5    second form; is that right?
6 A. Right.
7 Q. How long did your meeting with Martin last?
8 A. I think it was about an hour.
9 Q. Did you meet with him just one time?
10 A. Yes.
11 Q. Was there anyone else present?
12 A. No. It was just me.
13 Q. Anyone else present on behalf of the
14    Department of Labor?
15 A. No.
16 Q. It was just the two of you?
17 A. Yes.
18 Q. And what did he ask you?
19 A. Just what we paid, how we paid it, who we
20    paid it to.
21 Q. So he asked you questions that pertained
22    primarily to the tip out practice that we
23    have been talking about today?
24 A. Yes.

Page 256

1 Q. Did he ask you questions about anything
2    else?
3 A. What we were getting paid an hour, you know,
4    what hours, how many shifts I worked, just
5    stuff like that.
6 Q. Anything else?
7 A. No.
8 Q. That took about an hour?
9 A. About that.
10 Q. Did he ask you questions about anybody else
11    who worked at the Mardi Gras?
12 A. I don't remember.
13 Q. Did he ask you any questions about
14    Mr. Santaniello in particular?
15 A. No.
16 Q. Did he ask you any questions about Shannon
17    Corbett?
18 A. No.
19 Q. Did he ask you for any documents?
20 A. No.
21 Q. Did you bring any documents with you to that
22    meeting?
23 A. No.
24 Q. Other than the meeting you had with Martin,

Page 257

1    have you ever met with any other Department
2    of Labor official in any capacity?
3 A. No.
4 Q. Do you know whether the Department of Labor
5    interviewed anyone else in conjunction with
6    its investigation of the Mardi Gras?
7 A. I heard they did, but I have no idea.
8 Q. From whom did you hear that?
9 A. Just bartenders through there.
10 Q. Specifically?
11 A. There was a couple girls. But actually,
12    some of them still work for him, so.
13 Q. What are their names?
14 A. Kelly Gagne, I think, was one of them.
15    Chrissy Cabana had to meet with him. And
16    Bobbi Jo Murray.
17 Q. Do you know of anyone else?
18 A. No.
19 Q. What was Bobbi Jo Murray's position?
20 A. She was a bartender.
21 Q. Was it Kelly Gagne, you said?
22 A. Yes.
23 Q. Did you ever discuss with Ms. Gagne the
24    meeting that she had with the Department of

Page 258

1  Labor?
2  A. No.
3  Q. How did you hear that she met with him?
4  A. Just talk through the bar.
5  Q. You talked to her directly?
6  A. No.
7  Q. Do you remember who told you that?
8  A. No.
9  Q. How about Chrissy Cabana? How did you come
10    to know that she had met with the Department
11    of Labor?
12 A. She told me.
13 Q. What did she say?
14 A. That she filled out her paperwork and she
15    sent it and she was going to have a meeting
16    with him.
17 Q. So she told you about this meeting before it
18    occurred?
19 A. Yes.
20 Q. Did she ever have any other conversation
21    with you about it?
22 A. No.
23 Q. Was she a bartender?
24 A. Yes. She was a manager, and then she was

Page 259

1     brought down to a bartender.
2  Q. So it was during the period of time that she
3     was a bartender that you had this
4     conversation with her?
5  A. Yes.
6  Q. Did you ever have any subsequent
7     conversations with her about the Department
8     of Labor investigation?
9  A. No.
10 Q. Did you ever have any subsequent
11    conversation with her about her meeting with
12    the Department of Labor?
13 A. No.
14 Q. Did you ever discus with her what she
15    included on the paperwork that she sent to
16    the Department of Labor?
17 A. No.
18 Q. And Bobbi Jo Murray, how did you come to
19    know that she had met with the Department of
20    Labor?
21 A. Just talk through the bar.
22 Q. You don't remember who told you that?
23 A. No.
24 Q. Did you ever talk to Bobbi Jo Murray about

Page 260

1     it?
2  A. No.
3  Q. You and she never discussed any aspect of
4     the Department of Labor's investigation?
5  A. No.
6  Q. Do you know if that investigation was
7     concluded?
8  A. I have no idea.
9  Q. Do you have any idea what the status of that
10    investigation is?
11 A. No, I don't.
12 Q. So you don't know whether the Department of
13    Labor concluded that you were owed any money
14    as a result of that investigation?
15 A. Not as far as I know.
16 Q. How much do you think you are owed in
17    conjunction with the practices that are
18    subject of your claims in this matter?
19 A. I don't know.
20 Q. Do you have any idea?
21 A. No. I haven't even thought about it.
22 Q. You have never given any thought as to what
23    you believe you are owed?
24 A. No.

Page 261

1  Q. Have you ever given any thought as to what
2     you would settle for?
3  A. No. It is just too early for that.
4  Q. You don't have any idea?
5  A. No.
6  Q. If the Department of Labor had concluded
7     that you were owed less than $10,000 in
8     conjunction with the practices that it were
9     investigating, would you have any basis to
10    dispute that calculation?
11       MR. CASAVANT: Objection.
12       THE WITNESS: Can I answer this?
13       MR. CASAVANT: Yes, you can.
14 A. No.
15    BY MR. MILLER:
16 Q. So far as you know, the claims that you
17    assert in this litigation could be valued at
18    less than $10,000?
19       MR. CASAVANT: Objection.
20 A. I guess.
21 Q. Do you have any idea what your counsel has
22    demanded in settlement of your claims in
23    this matter?
24       MR. CASAVANT: Objection.